IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| 180s, INC., et al, | * | |
| | * | |
| v. | * | Civil No. JFM-13-03330 |
| | * | |
| J.C. PENNEY COMPANY, INC., et al. | * | |
| | * | |

\*\*\*\*\*\*

## MEMORANDUM

Plaintiffs 180s, Inc. and 180s, LLC ("180s") bring this action against Defendants J.C. Penney Co., Inc. and J.C. Penney Corp., Inc. ("J.C. Penney"), asserting infringement of two patents—U.S. Patent No. 5,835,609 ("the '609 Patent") and No. 6,880,174 ("the '174 Patent"). The parties now dispute five phrases from two independent claims—four phrases from claim 13 of the '609 Patent and one phrase from claim 11 of the '174 Patent. The issues are fully briefed, and there was a claim construction hearing on May 1, 2015. My constructions of the disputed phrases are explained below.

## BACKGROUND

In its lawsuit against J.C. Penney, 180s asserts independent claim 13 from the '609 Patent and independent claim 11 from the '174 Patent. Both patents relate to "around the head" ear warmers which wrap around the back of the head instead of on the top. The first claim at issue is independent claim 13 from the '609 Patent, which states in relevant part:

**13.** A covering device to be worn over the ears of an individual and extending around the back of the individual's head or neck, comprising:
. . .

two ear cups, one ear cup attached to the free end of the first curved portion and the second ear cup attached to the free end of the second curved portion, the ear cups defining a cavity formed from two support flanges, formed in a V-shape, and a semi-circular frame portion which extends between opposite projections of the

V-shape of the flanges, *the semi-circular portion and the support flanges defining a central opening, an attachment flange projecting from the vertex of the support flanges in a direction opposite the semi-circular portion, the attachment flange including means thereon for rotatably attaching the ear cups to the free ends of the first and second curved portions, and*

*fabric means covering the band and the ear cups on both sides thereof and forming a pocket within the cavity of the ear cups.*

*See* '609 Patent at col. 13, ll. 30–54. (ECF No. 42-2) (emphasis added to mark the disputed phrases). The other claim at issue, independent claim 11 of the '174 Patent, states in relevant part:

**11.** An ear protection device, comprising:
. . .

a first ear cup portion, the first ear cup portion being configured to receive the first locking protrusion to fixedly couple the first ear cup portion to the band, *the first locking protrusion including a barbed shape . . . .*

*See* '174 Patent at col. 12, ll. 24–35. (ECF No. 42-3) (emphasis added).

Both parties have submitted their proposed constructions of these five disputed phrases and briefs in support. Also pending is a motion to strike filed by J.C. Penney, which argues that 180s served a "supplemental claim construction statement" not provided for in either the scheduling order or Local Rule 805.1 and should therefore be struck.

## STANDARD

Claim construction is a question of law to be decided by the court. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks and citations omitted). Accordingly, "[t]he

purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro*, 521 F.3d at 1360 (quoting *Markman*, 52 F.3d at 976).

A claim's words "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (internal quotation marks and citations omitted).  In the claim construction context, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.  Sometimes, the meaning of claim language to a person of ordinary skill in the art is obvious and aligns with a widely accepted meaning; other times, the meaning of terms is not immediately apparent and requires a more searching inquiry. *Id.* at 1314.

In conducting the claim construction analysis, courts may utilize two categories of evidence: intrinsic sources and extrinsic sources. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed. Cir. 1996).  Because intrinsic sources are the most relevant evidence of the meaning of disputed terms, courts first should consider the claims, the specification, and the prosecution history. *Id.*  The context of terms in claims may be instructive, as may be the usage of terms in other independent or dependent claims. *See Phillips*, 415 F.3d at 1314.  But the claims, while of primary importance, must be construed in light of the specification. *Id.* at 1315.  "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics*, 90 F.3d at 1582); *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct

construction."). Despite the primary role the specification plays in the claim construction analysis, however, courts should be mindful of the fine line between "using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim." *See Phillips*, 415 F.3d at 1323. Courts may also cite the prosecution history, which includes "the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317. The history may inform whether the inventor limited the scope of the claimed invention, thereby providing reason for a court to narrowly interpret the claim terms at issue. *See id.*

Additionally, extrinsic evidence may inform the court's understanding of disputed claim terms. Extrinsic evidence includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence is, however, less reliable than intrinsic evidence unless it is analyzed "in the context of the intrinsic evidence." *See id.* at 1319. Thus, if a disputed term's meaning is unambiguous in light of the intrinsic evidence, extrinsic evidence cannot contradict that meaning. *See id.* at 1324 (citing *Vitronics*, 90 F.3d at 1583).

## ANALYSIS

### I.   J.C. Penney's Motion to Strike.

Before turning to the disputed claim terms, I will briefly explain why I am denying J.C. Penney's motion to strike. (ECF No. 43). J.C. Penney is probably correct that 180s violated the spirit, if not the letter, of Local Rule 805.1(e) when it filed a supplemental claim construction statement two weeks after J.C. Penney's responsive claim construction statement and two weeks prior to the deadline for the joint claim construction statement. Local Rule 805.1(e) requires a party to seek consent or a court order prior to amending a claims chart or responsive claims

chart, which 180s did not do when it filed out of turn.  Nonetheless, granting J.C. Penney's motion to strike would be too harsh of a penalty in this context for two reasons.

First, 180s' actions did not violate or obstruct the overall purpose of Local Rule 805.1—to provide a process whereby the parties determine which claim terms are disputed, propose their respective constructions, and produce a joint statement and accompanying briefing to the court. 180s' supplemental claim construction statement, although out of turn and likely intended to permit a first look at J.C. Penney's proposed constructions before responding, ultimately assisted the overall goal of producing a joint claim construction statement.  Which party goes first is immaterial from the court's perspective, provided that all parties timely provide their disputed terms and proposed constructions.  Here, both parties followed the scheduling order.

Second, J.C. Penney has not sufficiently demonstrated that it was prejudiced by 180s' supplemental statement.  J.C. Penney had two weeks after 180s' supplemental brief to prepare its portion of the joint statement and draft its opening brief in support of its own constructions. Courts have denied motions to strike even when the opposing party was probably prejudiced, such as when a party "changed [its] claim constructions on the day the Joint Claim Construction Chart was due." *Coupled Prods., LLC v. Nobel Auto. Mexico, LLC*, No. 09-0323, 2010 WL 2035829, at *1 (W.D. La. May 14, 2010).  Moreover, J.C. Penney did not ask for more time to respond to 180s' supplemental brief or delay the date on which the joint construction statement was due—J.C. Penney simply moved to strike.

In conclusion, even though 180s may not have followed the Local Rules as required I will not punish them by ignoring substantive legal arguments that help guide my interpretations of the disputed claim terms.  I deny the motion to strike.

## II.  The Disputed Claim Terms.

The following four phrases from independent claim 13 of the '609 Patent are disputed—

(1) "the semi-circular portion and the support flanges defining a central opening";

(2) "an attachment flange projecting from the vertex of the support flanges";

(3) "the attachment flange including means thereon for rotatably attaching the ear cups to the free ends of the first and second curved portions"; and

(4) "fabric means covering the band and the ear cups on both sides thereof and forming a pocket within the cavity of the ear cups."

The parties also dispute one phrase from claim 11 of the '174 Patent—"the first locking protrusion including a barbed shape."  Each is discussed in turn.

As a preliminary note, I have already construed four of the five disputed phrases in a July 2014 memorandum opinion.  *See 180s, Inc. v. Costco Wholesale Corp.*, No. 13-3239, 2014 WL 3725928 (D. Md. July 24, 2014).  Because of the significant overlap, at certain points I incorporate that opinion by reference.  J.C. Penney was not a party to that case, however, and has raised several new arguments that were previously unaddressed and which I have carefully considered here.

### A.  "The semi-circular portion and the support flanges defining a central opening."

The first disputed phrase in claim 13 of the '609 Patent was not construed in *Costco*: "the semi-circular portion and the support flanges defining a central opening."  J.C. Penney proposes that the phrase be construed as: ". . . the support flanges define a space that is unobstructed or unoccupied at the center of the ear cup."  180s proposes instead: ". . . defining an opening in, at or near the center of the ear cup."  The dispute centers on how to define "central opening" and whether that opening must be unobstructed and unoccupied.  I construe the phrase as "the semi-circular portion and the support flanges defining an opening in, at, or near the center of the ear

cup."  This construction rejects both proposed limitations by J.C. Penney and is supported by the intrinsic evidence.

I reject the first limitation proposed by J.C. Penney—requiring the "central opening" to be "unobstructed or unoccupied"—because it improperly narrows the scope of the claim.  J.C. Penney justifies its proposal by citing Figs. 28–30, which it argues are the only relevant illustrations that depict a central opening (226) defined by a semi-circular band (212) and two support flanges (216 & 218).[1]  The central opening in that figure is admittedly unobstructed and unoccupied, but "the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration."  *Anchor Walls Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306–07 (Fed. Cir. 2003); *see also Comark Comms., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (noting the "fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification").  Here, because claim 13 does not require or even mention whether the center of the ear cup should be unobstructed, I will not limit the claim based solely on Fig. 28.

There could be other supporting structures inside the central portion formed by the semi-circular band and support flanges, and that particular embodiment would not be contrary to the language in claim 13.  *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) ("While claims must be construed in light of the specification . . . limitations from the specification are not to be read into the claims . . . .").  Indeed, dependent claims 6 and 7 both contemplate an earphone and speaker, respectively, "positioned within the central opening."

---

[1] As will be discussed further below, J.C. Penney argues that only Figs. 28–30 depict claim 13 in its entirety because the "attachment flange" must also "project[] from the vertex of the support flanges," and only those figures have a vertex formed by support flanges and a central opening defined by the support flanges and the semi-circular band.

Even though 180s is not asserting those claims in this case, claim terms are to be interpreted "consistently throughout various claims of the same patent."  *See, e.g.*, *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1371 (Fed. Cir. 2005).  If I construe "central opening" to require an unobstructed and unoccupied space, I would necessarily be excluding "central opening" as it is used in claims 6 and 7, since placing an earphone inside the central opening is clearly an obstruction.  Instead, the "central opening" simply refers to a space formed and encompassed by the semi-circular band and support flanges.

I also reject J.C. Penney's second proposed limitation which defines "central" as the precise center of the ear cup.  I instead adopt 180s' definition of "central" as "in, at or near the center of the cup" based on the intrinsic evidence, its dictionary definition, and the word's commonly understood meaning and usage.  *See Vitronics Corp.*, 90 F.3d at 1582.  As cited by 180s, "central" is commonly defined (and, I believe, understood) as being "[s]ituated at, in, or near the center."  *Merriam-Webster's Collegiate Dictionary*, 10th ed. (1996) (ECF No. 42-9). The specification and corresponding illustrations depict precisely that—a space delineated by the support flanges and the semi-circular band that occupies the middle or "central" space of the ear cup.  Even Fig. 28, which is most-cited by J.C. Penney in support of their constructions of the disputed phrases from claim 13 of the '609 Patent, depicts a central space that occupies the top portion of the ear cup and not just the exact center.  J.C. Penney's limitation seems to conflate "central" with "center," and while the latter may support the limitation, the former does not.

In conclusion, my construction sufficiently describes the meaning of this phrase based on the text of the '609 Patent without improperly narrowing claim 13 by reading in limitations depicted by specific embodiments.

—

**B.  "An attachment flange projecting from the vertex of the support flanges."**

The second disputed phrase from claim 13 of the '609 Patent is "an attachment flange projecting from the vertex of the support flanges."  180s cites my previous construction from *Costco* to propose "a structure for attachment projecting from the vertex of the support flanges." The dispute centers on J.C. Penney's proposed limitation that requires the attachment flange to be construed as "a structure for attachment *formed as part of the ear cup* the projects from the vertex of the support flanges of the ear cup." (emphasis added).  I reject J.C. Penney's proposed limitation based on two maxims of patent law: a claim should not be narrowed based on a disclosed embodiment, and the doctrine of claim differentiation.

J.C. Penney justifies its limitation by citing Figs. 28–30, which clearly depict an attachment flange that is integrally formed with the ear cup.  Assuming *arguendo* that only Figs. 28–30 depict an "attachment flange projecting from the vertex of the support flanges," I nonetheless decline to read a limitation into the claim language based solely on the specification. *See, e.g.*, *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as bring limited to that embodiment.").  There is nothing in the language of claim 13 that requires the structure to take the exact form as depicted in Fig. 28.  Instead, it is possible to follow the language of claim 13 and construct an ear cup with support flanges that form a vertex and have a projecting attachment flange that is connected with a hinge or other structure that separates the flange from the ear cup.  Narrowing claim 13 based solely on Fig. 28 is not supported by any other intrinsic evidence and the phrase is sufficiently broad as to encompass embodiments beyond the only three that are illustrated. *See, e.g.*, *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364–65 (Fed. Cir. 2003).

I also reject J.C. Penney's proposed limitation because of the doctrine of claim differentiation, which "stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368–69 (Fed. Cir. 2005) (internal quotation marks omitted). Here, claim 5 of the '609 Patent—not asserted by 180s in this case—describes an "attachment flange *integrally formed with* the frusto conical cup portion at an oblique angle thereto." (emphasis added). Claim 13, however, which is asserted by 180s, omits any such "integrally formed" language. Because the limitation sought by J.C. Penney is present in claim 5 but not 13, the attachment flange in claim 13 is presumed *not* to be "integrally formed" with the ear cup. *See Seachange-Intern., Inc.*, 413 F.3d at 1369 (holding that the doctrine of claim differentiation also applies when comparing two independent claims, each with different words or phrases).

In conclusion, the intrinsic evidence and relevant maxims of patent construction justify my decision to reject J.C. Penney's proposed limitation.

**C.   "The attachment flange including means thereon for rotatably attaching the ear cups to the free ends of the first and second curved portions."**

The third disputed phrase from claim 13 of the '609 Patent is "[t]he attachment flange including means thereon for rotatably attaching the ear cups to the free ends of the first and second curved portions." Here, just as in *Costco*, all parties agree that this phrase triggers the means-plus-function analysis under 35 U.S.C. § 112(f).[2]  *See Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996) ("Patent drafters conventionally achieved this by using only the words 'means for' followed by a recitation of the function performed."). The first step is to

---

[2] Sometimes it is referred to as § 112, ¶ 6, but the same paragraph is now listed in the Code as § 112(f).

"identify the claimed function." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003). 180s and J.C. Penney propose slightly different claimed functions. 180s suggests my construction from *Costco*: "the attachment flange including a structure for attaching the ear cups to the free ends of the first and second curved portions of the band and for allowing rotation of the ear cups relative to the band." *Costco*, 2014 WL 3725928, at *5. As I explained in *Costco*, I find this construction to be well-supported by the claim language and specification and I also adopt it here.

The second step under § 112(f) is to determine which structures in the description correspond to the claim and perform the stated function. *See Omega Eng'g, Inc.*, 334 F.3d at 1321 ("A disclosed structure is corresponding 'only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.'") (quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)). Here, the parties disagree on whether Figs. 13–15, 21–24, and 33–38 are corresponding structures. For the following reasons I conclude that all of them correspond to the function recited in claim 13.

I rely on the language of § 112(f), which states that a means-plus-function element covers "corresponding structure[s] . . . *and equivalents thereof.*" 35 U.S.C. § 112(f) (emphasis added). J.C. Penney focuses on the alleged meaningful distinction between the patent's use of "attachment flanges" and "projecting tabs," but that argument sidesteps the issue of whether both structures are equivalent. I conclude that they are. As I stated in *Costco*, "attachment flange" is not a unique term of art; it simply means "a structure for attachment." *See Costco*, 2014 WL 3725928, at **3–4 ("[A]lthough an attachment flange may take multiple shapes and designs, it is always described or pictured as a structure for attaching the ear cups to the band."). Similarly, the illustrated embodiments in the '609 Patent with "projecting tabs" clearly depict the same

basic function of attaching the ear cup to the central band.  This suggests that the patent drafter

used slightly different terminology to describe the same core function.  *See, e.g.*, *Curtiss-Wright*

*Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (noting that "claim

drafters can also use different terms to define the exact same subject matter").

   If "attachment flange" and "projecting tab" are interchangeable, the fact that claim 13

only refers to "attachment flanges" does not require disregarding any disclosed embodiments that

omit the term.  Instead, the disclosed embodiments that refer to "projecting tabs," like Figs. 13–

15, must be analyzed to determine whether they are equivalent to Figs. 9–12, which depict

"attachment flanges."  A direct comparison demonstrates that Figs. 9–15 all illustrate an ear cup

attached to a central band through a hinge.  The fact that the former group describes the end of

the hinge that attaches to the central band as an "attachment flange" while the latter group

describes it as a "projecting tab," therefore, has no effect on the core function.  Moreover, the

function includes a means of attaching the ear cups in a way that permits them to rotate.  All

seven figures include a rivet hole, which the specification teaches "further permits collapsing the

ear covering portions into the band."  (ECF No. 42-2 at col. 6, ll. 1–4).  There is no

differentiation between the rivet holes among Figs. 9–15.

   Comparing Figs. 16–20 (which correspond to 9–12) with 21–24 (which correspond to

13–15) also supports concluding that these various embodiments are equivalents of each other.

Figs. 16–24 illustrate detailed views of the hinges that are between the attachment flange or

projecting tabs and the base flange connected to the ear cup.  The only difference is that Figs.

16–20 depict a "living hinge" while Figs. 21–24 depict a "further hinge embodiment[] . . .

[which] are generally contemplated to include a press fit relationship and/or a pin secured within

adjacent elements."  (ECF No. 42-2 at col. 6, ll. 40–44).  Once again, however, both hinges are

equivalent.  The specification teaches that Figs. 9–23 as a group all depict "a number of hinge embodiments," and "[t]he form of each of the hinges will be discussed in further detail below." (*Id.* at col. 5, ll. 48–53).  This characterization in the specification suggests the patent drafter intended the various types of hinges and accompanying subsets of embodiments to be variations on a common theme.  Indeed, the introductory description of Figs. 13–15 notes that they are "further hinge embodiments for the ear cup frame members." (ECF No. 42-2 at col. 6, ll. 40–41). Not "separate," "distinct," or "new" hinge embodiments, but "further."  Moreover, the guiding question throughout this analysis remains whether the Figs. 13–15 and 21–24 correspond to the claimed function of attaching the ear cups to the central band in a way that permits them to rotate.  There is no evidence that the two hinge embodiments discussed here are meaningfully different in this respect; both provide connection and allow for rotation.

Finally, I also find that Figs. 33–38 are corresponding structures.  They depict various perspectives and diagrams of the rivet holes on the hinges that are involved in the "means" to allow the ear cups to rotate about the central band.  All of Figs. 9–15, including those that J.C. Penney agrees are corresponding structures (9–12), depict a rivet hole.  Figs. 33–38 are analogous to Figs. 16–24 in that they illustrate a closer view of the rivet holes and the means by which they attach to the central band and permit the ear cups to rotate.  Moreover, the specification for those figures does not distinguish between "projecting tabs" and "attachment flanges," removing J.C. Penney's argument about the meaningful differentiation between the two.  Accordingly, I find no reason in the text or J.C. Penney's arguments to reject Figs. 33–38 as corresponding structures.

In conclusion, Figs. 13–15, 21–24, and 33–38 all depict various means of performing the function in claim 13 and are, therefore, corresponding structures.

**D.** **"Fabric means covering the band and the ear cups on both sides thereof and forming a pocket within the cavity of the ear cups."**

The final disputed phrase from claim 13 of the '609 Patent is "fabric means covering the band and the ear cups on both sides thereof and forming a pocket within the cavity of the ear cups."  180s proposes my construction from *Costco*, while J.C. Penney argues that this phrase is a means-plus-function term that triggers 35 U.S.C. § 112(f).  Although *Costco* did not address the applicability of § 112(f) to this phrase, I reject J.C. Penney's argument and adopt 180s' proposed construction from *Costco*.

First, this phrase is not subject to § 112(f).  Although a claim element that includes "means" raises a rebuttable presumption that § 112(f) applies, that presumption can be overcome.  Section 112(f) applies when a claim element specifies a function but does not recite the "structure, material, or acts in support thereof."  35 U.S.C. § 112(f).  A claim *does*, however, "recite[] sufficient structure if the term, as the name for structure, has a reasonably well understood meaning in the art."  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1357 (Fed. Cir. 2002).  Put another way, the question is whether a person trained in the art would be able to create a structure to perform the stated function based solely on the claim language.  Here, the relevant phrase is "fabric means," which sufficiently describes the relevant structure to someone trained in the art—fabric.

This is admittedly a broad term but encompasses several types of fabric, all of which perform the obvious function of allowing the wearer to comfortably place the ear cup on her ears.  The patent specification supports this broad definition of "fabric," which lists examples as "[a]ny number of materials . . . wear-resistant cotton blend or an entirely synthetic material . . . nylon-covered close cell neoprene or other moisture-resistant fabric."  (ECF No. 42-2 at col. 5, ll. 28–33).  The specification also teaches *how* the fabric should cover the ear cups and central

band.  For example, "[t]he various layers of the fabric material are combined by sewing or the like," (*id.* at ll. 23–25), and the specification corresponding to Figs. 6 and 7A describes how "a pocket is formed within the ear covering device" when covered by the fabric, and a slot can allow for insertion of earphones.  (*Id.* at col. 4, ll. 47–58).  The purpose of "fabric means" is also illustrated by several figures.  For example, Fig. 5 depicts the underlying structure without any fabric covering, whereas Figs. 8A–C illustrate "[t]he fabric completely cover[ing] the outside surfaces of the band and the ear cup frame members."  (*Id.* at col. 4, ll. 59–65).  Figs. 8A–C, therefore, depict a more complete product that is comfortable to wear.[3]  This intrinsic evidence amply demonstrates how "fabric means" is itself sufficient structure to avoid triggering § 122(f).  *See Cole*, 102 F.3d at 531 (holding that "'perforation means . . . for tearing' . . . describes the structure supporting the tearing function (i.e., perforations)").

Because this phase does not trigger § 112(f), I must construe it.  J.C. Penney does not offer a competing construction to 180s, who proposes my construction from *Costco*.  I incorporate by reference my analysis, 2014 WL 3725928, at **6–7, and adopt the following construction: "fabric that covers both sides of the band and the ear cups and forms a pocket included within the interior of the ear cups; the pocket need not have a slot or other opening for insertion of an earphone."

---

[3] Even if this phrase was subject to analysis under § 112(f), it is not indefinite and thus invalid. J.C. Penney argues that "forming a pocket within the cavity of the ear cups" is too vague based in large part on the expert's declaration.  I choose instead to rely on intrinsic evidence, and find that J.C. Penney cannot meet its burden to prove indefiniteness by clear and convincing evidence. *See, e.g.*, *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001). Simply put, a person skilled in the art would be able to form the "cavity" contemplated by claim 13.  The ear cups must be thought of in three dimensions: they are formed by rounded support flanges that form a flat cylinder.  *See* Figs. 9 & 13.  If one takes fabric and wraps it around that flat cylinder, there will be a "top" and "bottom" (or "front" and "back") to the ear cup, the inside of which is the "cavity" or pocket contemplated by claim 13.

**E.   "The first locking protrusion including a barbed shape."**

The last disputed phrase is from independent claim 11 of the '174 Patent—"the first locking protrusion including a barbed shape."  J.C. Penney proposes the following construction: "the first locking protrusion having a sharp pointed shape angling away from a sharp main point as in a fishhook, arrowhead, or arrow so as to make extraction difficult."[4]  180s proposes "the first locking protrusion having a pointed shape angling away from a main point so as to make extraction difficult," which I adopted in *Costco*.  The dispute, therefore, comes down to two factors: whether the "point" must be "sharp," and whether the list of three examples should be included.  I adopt 180s' proposed construction.

First and most fundamentally, a "barbed shape" is commonly understood as a specific form utilized by many different objects that comports with the illustrated embodiments in the '174 Patent.  Dictionaries—extrinsic evidence often cited by courts—all define "barb" similarly. *See The New Oxford American Dictionary*, at 128 (2d ed. 2005) ("A sharp projection near the end of an arrow, fishhook, or similar item, angled away from the main point so as to make extraction difficult.") (ECF No. 42-11); *Random House Webster's Dictionary*, at 56 (4th ed. 2001) ("A point projecting backward from a main point, as of a fishhook or arrowhead.") (ECF No. 45-9).  The "barbed shape" as described by the dictionaries comports with the intrinsic evidence; namely Fig. 19 of the '174 Patent.  It depicts two barbed shapes, linked consecutively, at the ends of the central band which slides into the ear cup.  The specification confirms the depiction by describing the "barbed shape's" purpose as allowing "the protrusion-locking

---

[4] In a supplemental brief, J.C. Penney proposes adding further language to clarify that "barbed shape" excludes certain embodiments illustrated in Figs. 2A, 3A, 4A, 4B, 20, 21, and 22.  (ECF No. 61 at p. 20).  I reject that proposal since requiring a "barbed shape" is sufficient by itself to reject alternative embodiments in which that shape is not present.  I will prohibit any future attempt by 180s to include those illustrations as relevant embodiments of a "barbed shape protrusion."

portions 1211 and 1212 to be retained within the ear cup portions 1230 and 1240." (ECF No. 42-3 at col. 9, ll. 25–27). Because the "barbed shape" as depicted in Fig. 19 has four points that angle away from the main point, it would be difficult to retract the central band from the ear cup.

Second, although many (but not all) of the dictionaries cited by the parties describe the "point" of the barb as being "sharp," I will not read "sharp" into claim 11 of the '174 Patent. Intrinsic evidence trumps extrinsic evidence, *see Renishaw*, 158 F.3d at 1250, and here there is no logical explanation for why the drafter of the '174 Patent would have intended to have sharp, fishhook-like protrusions inside of an ear cup covered only by fabric and resting on a wearer's ear. Sharp points on a barbed shape are typically used to pierce skin, such as the skin of a fish or the hide of an animal. The "barbed shape" protrusion at the end of the central band depicted in Fig. 19, by contrast, can perform its function simply by having the side points projecting at an acute angle away from the main point to make extraction difficult; none of the points need to be sharp for piercing.[5]

Finally, because I construe the phrase as not requiring the points to be sharp, I similarly reject J.C. Penney's proposed addition of examples of "barbed shapes" to the construction. Once again, many dictionaries cited by both parties include fishhooks and arrows as common examples of objects with a barbed shape. Those definitions, however, are extrinsic to the '174 Patent and are not binding. My concern here, as it was in *Costco*, is that adding examples of barbed shapes with sharp points suitable for piercing would confuse the jury. *See Costco*, 2014 WL 3725928, at *8. The fact-finder will be able to understand the purpose and function of the

---

[5] J.C. Penney's citation of the prosecution history is not contrary to my holding. The Examiner did allow the '174 Patent because the prior art lacked any reference to "the barbed shape of the locking protrusions," but there is no evidence that the Examiner understood or required that the points of the barbed shape must be sharp. As for abandonment, any statements cited by J.C. Penney are "too vague or ambiguous to qualify as a disavowal of claim scope." *Omega Eng'g, Inc.*, 334 F.3d at 1325.

"barbed shape" protrusion based on my construction and Fig. 19; no further examples or explanation is warranted.  "Barbed shape" evokes a clear shape that is sufficiently depicted by Fig. 19.

## CONCLUSION

For the foregoing reasons, I adopt the constructions described above.  They comport with the intrinsic evidence and relevant principles of claim construction.


_____05/28/2015_____                    _____/s/_____
Date                                          J. Frederick Motz
                                              United States District Judge